And Mr. Reed is here for the appellate. Mr. Tillery is here for the government. Mr. Reed, you may begin when you're ready. Thank you. Mr. Reed, you're here for the Florida Department of Corrections. That is correct, Your Honor. I'm ready whenever you are. May it please the Court, Counsel. Also, I have my General Counsel for the Department, Kenneth Steeley, is here with us today as well. So, my name is Kirk Reed and I represent the Department of Corrections in this case. And as the Court knows, this is an Eighth Amendment, cruel and unusual punishment case arising out of the Department's treatment of a transgender inmate currently housed with the Department. Starting just with the first principles, the Eighth Amendment is the unnecessary and wanton infliction of pain. Let me ask you this. I mean, this is a deliberate indifference claim, right? It is. So, let's talk first about the policy, which is no longer in effect, the freeze frame, what we'll call the freeze frame, the blanket policy. No treatment beyond what you're currently getting ever, no matter the circumstances, right? That was once the policy. Whatever you get on the way in the door is what you get. That was once the policy. And so is that – would you be willing to concede that that, in response to an acknowledged serious medical need, which you've acknowledged, right, the gender dysphoria qualifies, that that is textbook deliberate indifference? We're not even going to think about your condition or assessing you individually. We're just going to apply a policy. It is a little bit more nuanced, Judge Newsom, because at this – when the inmate came to us, what was happening was counseling was being provided. It wasn't just nothing, go away, we're not going to talk to you. It was just on the hormone side, and remember, the inmate had received hormones for approximately five to six weeks. It wasn't a long period of time. So I don't want to say that it is a classic textbook, but I'm not arguing the old policy. I mean, I think that's clear from the record, from our arguments, our briefs, that we're talking about what's happened since hormone therapy has been provided. Just to provide the foundation, the reason I ask the question is it just strikes me that if you acknowledge that dysphoria is a serious medical need, and even if she is getting some treatment, some counseling on the way in, if you say, we're not going to think about your current condition any further, that just strikes me as like anti-medicine. Medicine, it seems to me, requires some individualized assessment and treatment. And if you say, we don't care about individualized circumstances, that does seem pretty head in the sand-ish to me, which sounds like deliberate indifference. And that's – the policy has changed, and it is not that policy anymore. And that's important, Judge, in this case. It's an injunctive case, which must, by definition, look forward. So Judge Walker, in this case, couldn't enjoin something that has already been abrogated and replaced. So the focus that I'd like to bring is what is happening now, and is that deliberately indifference? So what your argument is, that basically their case is moot? That portion of the case, I think, is certainly moot because the evidence is undisputed that we submitted affidavits, that we're not going to roll back these protections. Let me – I remember what you've said in it. But what would you have to go through in order to go back to a different policy like the freeze-frame policy? Well, we would have to rescind our current policy. What would that take? And it would take an internal review of the policy. It would go through the medical staff. It would go through the psychiatric departments. It would go through legal. And so can a department abrogate a policy? It could, but the evidence in this case and what I'm telling the panel right now is we're not. In fact, the policy has been even expanded to have – afford further protections to transgender inmates currently. It's not – in other words, it's going forward. It's not going back to the old policy. And the evidence in the record, I think, is fairly undisputed that we are not rolling back anything that we're doing now. Unless it's medically, you know, contraindicated. But there's going to be no effort in that regard. Now, the plaintiff in this case, was she receiving counseling at the time of the freeze-frame? She was. And that was through the Department of Corrections. In other words, the FDOC was providing that counseling. That's correct. And also, she received some type of garments, I think, at one point. She has. And where is that? I know that you've changed that policy. But what is the policy now with regard to clothing and other means by which the plaintiff and those like the plaintiff would be allowed to adapt and, I guess, continue their process? The policy is very strictly on a case-by-case, inmate-by-inmate basis, which addresses the blanket concern that Judge Newsom had. And the generally applicable grooming and hair-link policies that are applicable for various reasons, security among them, obviously. This is a prison we're talking about, are still in place. Now, Ms. Cohane, the plaintiff in this case, because of Judge Walker's injunction, obviously, is not subject to those. But as a general matter, it's done on a case-by-case basis. And remember, in these instances, not every transgender inmate is going to say, I have to have long hair. It's a very, very evolving and somewhat complicated area. The problem that I have with the department's argument is that Judge Walker made very specific, detailed findings confined to Mrs. Cohane and not anybody else. He says, I'm applying this injunction with regard to Ms. Cohane, so I'm not establishing any broad policy just for Mrs. Cohane. And he says that there's an exception to mootness. This case is a moot based on the voluntary cessation doctrine. And he made that determination by making specific findings of fact. He says there was a reasonable probability that, or that you did not establish that there's a reasonable probability that you would not reenact the freeze frame policy. And he makes findings of fact. What findings of fact are clearly erroneous? You got to find that these, we have to find that these findings of fact are clearly erroneous. And I don't see how we do that. He was very specific in his order. There's no question about that. And on this, and on many of the findings of fact, we will accept them as they are because I'm not going to convince the panel to overturn a clearly erroneous finding. Can you point us to a clearly erroneous finding of fact? I think on the voluntary cessation part of the opinion, which is secondary to my main argument that this is simply not deliberate indifference. But just on the voluntary cessation, we changed the policy. And as the case law says, that's an unambiguous example of a change of policy. What else can we do as a department? We changed the policy. Second, what judge, I'm sorry, Your Honor. He's suspicious about the timing of the changing of the policy. And he found that the timing of the change is an attempt to manipulate jurisdiction in order to avoid liability on the part of the department in this case. Judge Walker says, I make this finding. That's one finding. That's one of the factors that you take into consideration. Did you change the policy in order to avoid being found liable in this case? He says, I make that finding. How do we find that finding is clearly erroneous? What was based, the only evidence that was introduced at the trial to support that cessation doctrine was one, what I call a mystery grievance that an inmate filed that postdated the change in policy. There was no context for that grievance. And in that grievance, the response was it seemed to harken back to the old policy, meaning that, well, we're going to keep you where you are on your, whatever your current treatment is. And that was simply wrong. But there was no other evidence other than that one exhibit. I think it was plaintiff's 25 or 26. That's all Judge Walker had to go on. I mean, he had several other findings of fact. He cites the lack of evidence detailing any deliberation about the change, which is another factor that you take into consideration. He says there wasn't any evidence detailing any deliberation about the change. That's one of the things we look to to determine whether or not there's an exception to mootness pursuant to the voluntary cessation doctrine. We've got to find that finding of facts clearly erroneous, right? You do, Your Honor. And, again, I say other than the department's ability that it did, in fact, change the policy. And it is continuing to do exactly what that policy says. There's evidence in the record that the department created an entirely separate place and housing unit just to make the diagnosis on these things. So a lot of progress had been made factually. But to me, Your Honor, before we would even need to get to the voluntary cessation doctrine, Judge Walker, even assuming his facts are true, what we're doing… We cannot constitute deliberate indifference under any stretch of any case that I have found from this circuit or anywhere. Okay, hang on one sec. I know you want to get there so badly. We'll give you the time that you need to get there. But I've still got a mootness question. It seems to me there might be two slightly different buckets here. The freeze frame policy, to the extent that the district court's injunction enjoins a policy that no longer exists, that you have repealed, and that, as Judge Kugler says, you'd have to jump, sort of move heaven and earth to reinstitute, that seems pretty moot to me. And we've said time and time again that when government actors repeal policies that, you know, we sort of give them a presumption in favor of mootness, that they're not going to voluntarily go back on their word. But then, now that the freeze frame policy is out, now that you are treating Ms. Kohane, is that how you pronounce her name? It's pronounced Kohane. Kohane. So now that you are treating Ms. Kohane with hormone therapy, that now, absent the freeze frame policy, is sort of like an individualized thing, right? But so what guarantee do we have that you won't go back on giving her the HT? We have the affidavits that were submitted by the chief medical director of the entire department that said we're not. But you sort of see my point, right? The mootness inquiry is slightly different with respect to the freeze frame policy because there you get all this tailwind from our case law that says where you've repealed the policy and replaced it, we're going to give you the benefit of the doubt. Now that we're talking about an individualized inquiry, it's a little bit tougher because you don't get the same tailwind. Is that right? That is right. And I would suggest that there's nothing in the record that would indicate that we are planning on. And that would be just the rebuttable presumptions in our favor. Yes. So to Judge Kugler's point on the individualized HT treatment, what would you have to do in order to reverse course and say now we're taking you off the HT? What would have to happen? Many transgender inmates don't need or ask for hormone therapy. But so she has. She has. It's an individualized basis, which makes it very difficult for me to say it'd be a – ironically, it'd be a blanket policy. But would her medical team have to say we've changed our mind? Like we were basically unanimous that she needed HT. That was a medical necessity, and now we've changed our mind she doesn't. Exactly. This is causing great harm to the plaintiff now, which there are various side effects. Don't pretend to be a doctor. They're very serious. If those were shown, that is one instance. The problem is that Judge Walker found that those affidavits where they said we're not going to reinstitute the freeze frame policy. He made a specific factual finding. I find those affidavits not credible. So, I mean, we have to say, well, that finding is clearly erroneous. And I don't see how we say that's clearly erroneous because he conducted the credibility evaluation. He's the district judge. He conducted the credibility evaluation. He made a finding of fact. And so you've got to convince me that that's clearly erroneous. That's a pretty heavy burden to overcome. It is. It is, absolutely, which is why I wanted to focus on the legal side. And let's just give the judge those factual findings. The case law and the standard is if the facts are what they are, the ultimate legal determination that that is a violation of the Eighth Amendment, that's afforded no deference. That's a de novo review. And I think we have to understand what we're doing today for this court to understand why the deliberate indifference analysis was so erroneous. I mean, to me, there would be no standard whatsoever if Judge Walker's standard is in place. But I have badly overrun my time. I think we said that he could tell us about deliberate indifference. Tell us about the merits. Please do because I've been cutting you off every time you try. I do. I appreciate it. You just tell me when I'm done. But on the merits of the case, those standards, deliberate indifference, that word deliberate means something. The department has to know what it is doing. This is today we're talking about. It has to know what it is doing. It has to know that it is, by what it is doing, is causing the wanton inflection of pain and then still do it. So this is not a standard that is even akin to state court medical malpractice. This is a standard that the court, Supreme Court, this court has set as an extremely low bar. And the law is crystal clear that as long as some treatment is being provided, deliberate indifference is not found. The only exception to that some treatment is if that treatment is, quote, this is from this court, so cursory as to be tantamount to no treatment at all. Here's a fact, here's on the merits. Here's a factual finding in particular. Judge Walker says the department knew of her gender dysphoria diagnosis, her continued request for hormone treatment, her self-harm, her suicide attempts, and still delayed treatment for two years. I find the treatment that they now agree is medically necessary. The delay was the delay in getting the inmate to an outside endocrinologist. We discussed this at the preliminary injunction hearing. There was an unnecessary and could have been better type delay. I don't dispute that. He says your chief medical officer, he says your chief medical officer's testimony was, quote, dubious and, quote, flippant. And it included, quote, unenlightened comments that served as, quote, red flags. I mean, this is a strong order he entered. I think there's no doubt about that, Your Honor. And I think it is an order that, frankly, is unfair given. He's talking about Dr. Whalen, who came on the stand and said exactly what he thought, that it is a— Dr. Whalen testified differently than—well— He was our chief medical officer who testified at trial. He testified differently than Kohane's experts. As our expert, testified differently than Kohane's experts. And the court can credit the testimony of her experts over your experts, can it? And the court credited our expert quite explicitly. So maybe I'm confused, but I thought that the colloquy that you're now having with Judge Wilson was about hormone therapy. And that your response would be to say we're giving it to her and we're not going back on it. That piece of the case is moot. Now let's talk about social transitioning. And with respect to social transitioning, there's this split of opinion among everybody who looked at her. Her own medical team said that's not medically necessary. The only person I can tell in the case that has said that is medically necessary is her own hired expert. That's precisely right, because the things we're doing satisfy the deliberate indifference standard. We're providing hormone therapy. We're using gender-appropriate pronouns, which our expert and Ms. Kohane's experts said is the most satisfying thing one can do. We're also providing a bra. We're providing housing in the most safe, effective way possible. And the inmate gets mental health counseling and individual sofa alone showers. All of these things recognize and treat the dysphoria. And critical to this, your honors, is that Ms. Kohane herself says they help. They do help. So it is difficult for the department to understand doing all of these things that conceitedly help the plaintiff. At the same time, we're somehow being deliberately indifferent and inflicting wanton pain on the plaintiff. The only thing that we did not do was allow an exception for long hair and makeup. And it is difficult for any medical doctor or any court to say that long hair and makeup are so medically necessary that to deny them is deliberately indifferent and a violation of the Eighth Amendment's Prohibition on Cruel and Unusual Punishment. So I want the courts to focus on the legal argument we're making because Judge Wilson, you're right. I know Judge Walker's order. I mean, we tried the case with him. I know where he is on this. Unfortunately, I do not think he is where the law is on this. The Fifth Circuit, the Tenth Circuit, the First Circuit have all said in the context of a sexual reassignment surgery case that the WPATH standards that Judge Walker relied on are not binding on these departments. And if all those cases say they're already providing hormone therapy and mental health counseling, and in so doing, you cannot meet the standard of deliberate indifference. And that's what we're doing as well. I got that. But there was a period of time that you were not providing the hormone therapy. Isn't that correct? That is correct. During that period of time, then, could the judge, if his opinion is based on that, could that not support a finding of deliberate indifference as to that? It could only to a moot and abrogated policy. And under Ex parte Young and every other case, injunctions have to be prospective looking against the state. And that is why that's the focus. It should be the focus. And that's why we're asking the court to dissolve the injunction and reverse and render. I mean, I know what happens if we go back before Judge Walker. I'm pretty clear on that. But I do think the law is very, very different than how he enunciated it. So, if I have any more time, I'll reserve that to respond. And thank you for the extra time. All right. Thank you, Mr. Reed. We'll hear from Mr. Tillery. Good morning and may it please the court. My name is Daniel Tilley and I represent the plaintiff, Appali Rain Cohen, in this case. The district court's order in this case is the only thing preventing serious ongoing psychological harm to Ms. Cohen. And the court issue here is social transition. And it involves a straightforward application of Eighth Amendment law. So, when you say the core issue of social transitioning, are you, it sounds like, sort of willing to move on beyond the HT? She's getting it. Policy has been amended. We kind of trust the DOC that they're not going to go back on HT. And so, now we need to be looking forward toward the ST that she's not getting. That's not what I'm saying. I do intend to address the voluntary cessation issue. I can do it now if that's clear. No, either way. I just wanted to kind of figure out if there was any common ground. Not on that point. No. Yeah. So, the core issue is social transition. And Ms. Cohen has been living and presenting herself to the world as female since she was 14, wearing women's clothing, hairstyles, makeup, using pronouns with her family, and at school, adopting a feminine name, changing her name. And the district court talked about the DOC's conduct in prison. The district court, Judge Walker said, defendant is forcing Ms. Cohen to live outwardly as a man in ways that, though seemingly banal to some, strike at the heart of what it means to be perceived as a man or a woman. And we can show numerous instances of significant harm to Ms. Cohen in DOC custody. For example, in October 2014, she attempted to hang herself because of the refusal to provide transition-related care. So, can you help me with that? Because I noticed in your brief, roundabout pages 21, 22, 23, you did try sort of chronologically to link up the suicidal thoughts or tendencies or attempts to the transitioning aspect of the case. But the only really core linkage that I could ever find was between suicide attempts or ideation to the denial of HT. Like, you know, they're not giving me my HT, and so I'm going to hang myself. But I never saw they're not giving me ST, social transitioning stuff, and therefore I'm going to hang myself. Is there clear evidence of that linkage? There is. Okay. Help me. One of them was in October 2014 when she attempted to hang herself, and it was because of the confiscation of makeshift bras and female underwear. That was discussed at trial testimony, page 33 to 35, also in her declaration. ECF 3-1 at page 5, paragraph 17, and there was a discharge summary that documented that as well. She also, in January 2015, she attempted to remove her testicles following an officer threatening to confiscate her female undergarments and cut her hair. And, again, there was documented evidence of that. Trial testimony day one at 36. There was also an emergency room record that reflected the laceration. And plaintiff's self-report, I'm upset because officer asked me to take off my bras. They cut my testicle. There was another officer reporting that there was a conflict over stuffing her shirt to mimic breasts. There have been numerous incidents involving dress and behavior conflicts. This is from officials at the DOC writing these notes. There was a time when she attempted to self-castrate by using a rubber band as a ligature around the base of her scrotum and tolerated the pain for five days. Plaintiff's expert, Dr. Brown, said he had never seen any person tolerate that for more than a few days, and Ms. Cohan tolerated it for five. There was a number of instances, at least six, of forced haircuts. And these, of course, are tied to social transition, and she talked about the trauma of the forced haircuts. She said, you know, when she tried to, for a trial, she was going to have her hair trimmed up to look nice. She said, the feel of the clippers and the sound of it made me have a total panic attack. She curled up, hyperventilated. She said, it's the worst, most degrading, makes me feel like just the lowest of the low, extremely depressed. I have severe anxiety of this ever happening again. It's every single time, it's been a nightmare of an experience. There were also times in April 2017 when she tried to cut off the blood flow to her neck, and that also was related to an attempt to cut her hair. And plaintiff's expert, Dr. Brown, he talked about the long-term effects of this. Of course, there's the suicidal ideation. Of course, there's the attempts at self-castration, but there's other harms as well that play out over time. He talked about depression, general inability to function. He said she would possibly be put in and out of their psychiatric unit for psychiatric care. He talked about really uncontrolled and unmanageable anxiety. It's important to note that the DOC's expert in this case agreed. The DOC's expert, Dr. Levine, agreed that if she was unable to get access to the hair and clothing that she's seeking, she would be, quote, vulnerable to acute decompensation. This is from the DOC's expert. He said she would, quote, have a suicidal ideation and crisis. That's from his trial testimony at page 403 in the deposition at 165. This was all tied to the lack of treatment for gender dysphoria, including her need for access to social transition. She made this clear in her grievances. She made it clear in the conversations. She's had many, many conversations, and she testified to that in all her interactions with mental health and medical professionals in DOC custody. And Dr. Brown referenced in the trial testimony, his trial testimony, the breadth of the records here. He said, I mean, I had hundreds of pages of the medical records, administrative records, disciplinary reports, documentation of clear distress. We have documentation of ligature marks on the neck remaining at least two days. So let me just ask you this question. I tried to keep track of all of the various doctors in the case, those who have treated her, those who have come in for litigation purposes. Johnson, her team is Johnson, Belt, and Rivera, Guevara, right? They say social transitioning is not medically necessary. They don't say that. And the judge made a factual finding that they did not say that. They use words, some of them, Rivera and Johnson, will use that phrase medically necessary, not medically necessary. But they make clear in their testimony other parts of the depositions that are not cited where they say that means life or death. Now, of course, life or death, that's not in litigation. That's not a court's definition of medical necessity. They use a idiosyncratic definition that is not the definition that's used in cases. Similarly, Santero says, and he was the one hired by Wexford to make the evaluation. Santero says not medically necessary because he doesn't consider mental health needs to be medically necessary. He says medical means the body, and in prisons you have medical departments, you have mental health departments. But he says medical department, that's medical necessity. Mental health department, that's something else. Of course, in case law, mental health needs can be medically necessary. He just doesn't use that terminology. Similarly, Dr. Levine, he doesn't use the phrase medical necessity. He uses different language. So they might, some folks do say, sure, not medically necessary. But in their mind, it's because she's not going to die if I don't provide it. Of course, in case law, it's replete with examples of things that are medically necessary. It's medically necessary to treat someone's broken foot. There's a case from this court saying if you delay four hours in treating the broken foot, that's deliberate indifference. There was medical necessity there. Obviously, you're not going to die if you don't treat a broken foot. So the judge made specific factual findings. Judge Wilson read one of them. Another one is, what's clear from the treatment team's testimony is that everybody knows Ms. Cohane has harmed herself and attempted suicide, but still nobody has requested any exceptions to the clothing and grooming policies. A second factual finding, the mental health team never evaluated whether Ms. Cohane has a medical or mental health need for access to female clothing and grooming standards, despite her persistent request, because they believe defendant's security policies prohibit such treatment. A third factual finding, the treatment team failed to make this assessment, despite their shared knowledge that treatment for gender dysphoria includes social transitioning, and the failure to treat can lead to self-harm and suicide. A fourth factual finding, experts on both sides agreed that defendants should allow her access to female clothing and grooming standards to treat her gender dysphoria. Accordingly, this court finds that such treatment is necessary to treat her serious medical need. He says they ignored a substantial risk of serious harm to her mental and physical health and reliance on defendant's clothing and grooming policies. What is it that you're asking or pointing out to us that still, I know she's getting the hormone therapy, okay? And I know you want that to continue, you want the injunction to continue. What else is it that she is not receiving that you believe or may be receiving only because of the injunction that you feel like if the injunction goes away, she will lose? She would lose the aspects of the injunction. She would lose the long hair, the makeup, and the access to female undergarments. I don't think so. I mean, she would lose at least that. I mean, if the court reversed some of the aspects of it, she could lose a whole… All right, can you talk just a minute about the requirement under the Prison Litigation Reform Act for the specific findings concerning need, narrowness, and intrusiveness? Sure. And it seems like to me that the judge did not make the specific findings. I read your arguments about that. Sure. But shouldn't the judge have made a finding specifically as required under the statute before an injunction dealing with, really, let's talk about the ST because that seems to be the thing that's more at risk right now. The judge didn't use the words Prison Litigation Reform Act. The judge did, however, make the findings that are required by the Prison Litigation Reform Act. And we can go through them one by one. So one is that… Are you just going to read what's in your brief? If you're just going to read what's in your brief, I don't need you to do that. Okay. Well, so on necessity, the whole opinion, of course, is about necessity. On narrowly drawn, of course, it only applies to the plaintiff. On least intrusive means, it's only doing what the district court, what the DOC said they would do if deemed medically necessary. They have said if there's a finding of medical necessity made, we will provide the care. So you can't say that it's going beyond the public safety needs of the prison. Do you find any weight in the FDOC's contention that some of the ST issues would be counter to good security issues in the prison? Or do you believe that the prison should be required to set up different housing units completely for different individuals depending on how they identify? I don't have an opinion on the housing point. But with respect to security, they… Well, isn't that part of it, though? Well, the security expert on their side, Mr. Upchurch, he did talk about there's a variety of ways to keep people safe for sure. One is putting folks in certain types of housing. There was a time when she was in an open bay dorm with inmates who were 55 or older. So she felt safer there. They apparently thought she was safer there. She's been in a lot of different environments. There's different ways folks can accommodate safety. The important thing is here, they've said they can do it. You can look at the 30B6 testimony. He says if it's medically necessary, we'll figure it out. We'll accommodate it. Their security expert said the same thing. So not just the 30B6, not just the security expert. Dr. Whalen said the same thing. If I find medical necessity, security is going to have to deal with that. So there's really not a fight now. There was a lot of litigation, a lot of depositions around security. But then ultimately the conclusion that they came to was if it's medically necessary, we'll provide it. And I would invite the court just to take yes for an answer from the DOC when you have a 30B6 saying we will do this. That's really all I can say now. It might, you know, we'd be having a different conversation, perhaps a very interesting conversation if they were saying no, even if medically necessary, we're, no, we can't do it. It's too high a risk. Then this would be a different case. We'd be having a very interesting conversation about all the things that we've litigated in the case. That's just not the circumstances we're in right now where they're saying if it's medically necessary, which there's been a factual finding of, then we will provide the care. From the ST standpoint, what distinguishes this case from the, maybe it's the first and 10th circuit cases, LAM in the 10th and COSILAC in the first. Those are both gender dysphoria-ish cases, both cases in which the inmate is getting some treatment but not everything he or she wants. And the courts there seem to say there's a genuine dispute among the experts, among the scientists, the doctors who have weighed in whether or not this further treatment is necessary and thus no deliberate indifference. So if we were to say that there's deliberate indifference in the denial of the ST here, would we be putting ourselves athwart the first and 10th circuits? No. In LAM, the 10th circuit specifically cited, and I believe that was a pro se case, but in LAM, the court specifically cited the sparseness of the summary judgment record. I don't think folks can say that this record is sparse in any respect, and that's often, frankly, the case in litigation concerning the rights of transgender inmates, is that most of these cases, frankly, are brought by folks who are pro se, who obviously can't afford experts, can't afford to do depositions, can't afford to really explore all the issues that need to be explored. With respect to COSILAC, it's important to note that that's a surgery case, number one. Number two, the court specifically talked about the social transition that was being provided in that case, and to be sure, social transition that's well outside the bounds of what's being discussed in this case, and the court cited that, number one, as medical care, and number two, cited it as it talked about the substantial way in which the provision of that treatment alleviated the harm of the gender dysphoria. So COSILAC is its own case about something that's not about what we're talking about here. But even so, wasn't the—I mean, there was some aspect of treatment being denied in COSILAC, right? Right. And maybe I'm misremembering, and feel free to correct me, but I thought that the court said with respect to the stuff not being granted, the reason we're not concluding that there's deliberate indifference is that there's like a genuine debate among the doctors who have thought about this, whether or not this is necessary. A genuine debate in the case? Yeah. About whether— Which is sort of what we have here. I don't think so, actually. It's important because now—so the plaintiff's expert thinks this care is medically necessary. The treatment team, there was a factual finding that I think is well-supported that found that they actually didn't make a determination, and that instead deferred to security interests. And then Dr. Levine, he agrees again that she will be vulnerable to acute decompensation. So he doesn't talk in the language that courts talk. He doesn't say medical necessity in that sense. But his comments fulfill any definition of medical necessity. His comments say acute decompensation or suicidal ideation in crisis, if not provided. We're not in a case where this is actually a dispute between experts where you have, well, here's a qualified practitioner on the DOC side saying, no, we don't need this, and we have a plaintiff's expert who just disagrees. This is not a simple disagreement case, a mere disagreement case. This is everyone actually either didn't make a determination or those who did agree that it's medically necessary. And in Conflict, I would say also, I mean, the court, they acknowledged again that the social transition was actually providing some amount of care, and they just didn't agree that there was sufficient harm from not providing surgery. That was a separate inquiry. If I could go back to the Prison Litigation Reform Act and the requirements that the injunction be narrowly drawn and the least intrusive necessary to correct the violation of a federal right. You're not saying that the order entered by Judge Walker lacks sufficient factual findings to satisfy the need and the narrowness and the intrusiveness requirements, are you? No, we're certainly not saying that. There are, I mean, it's a long order. It's been a while since I've read it, 61 pages long.  The requirements of the Prison Litigation Reform Act that we would have to find are clearly erroneous. Yes. Well, I mean, you'd have to find that necessity was clearly erroneous. Number one. But I'm talking about factual findings to support these requirements. Are there in the order? The factual findings? Yes. So on the need question, whether it's necessary to correct the violation of the federal right. So the necessary part would be, is the care medically necessary? And so if the judge did make a factual finding as to medical necessity, on the narrowly drawn part, it only applies to plaintiff. I mean, you can call it a factual finding. You can call it inherent in the issuance of the order. It's an injunction that specifically and can only apply to one particular. So it's narrow because this injunction doesn't apply to anybody else, right? It just applies to Mrs. Cohane. That's right. Okay. All right. I would ask that if there are no further questions, I would ask that you affirm. All right. Thank you, counsel. And Mr. Reed, you reserve some time. Thank you very much, Your Honor. Even though I did go over, I appreciate the extra reply. There's certainly on the case law from the Circuit Courts of Appeal, it's very important. To me, there's little question that this court would be going very much against the First Circuit in Bank and the Tenth Circuit in Lamb. Very recently, just in March of this year, the Fifth Circuit also issued a lengthy opinion by Judge Ho. So let me just ask you this, down to sort of brass tacks in this case. I'm now a little confused about whether or not there are or are not – whether there is a genuine factual dispute about the necessity of ST. I thought that I had read the record to understand that her medical team, in-house medical team, had said ST is not medically necessary. But your friend tells me that's, in fact, not quite right. In other parts of the depositions not cited to you in the briefs, they actually said, at worst, neutral. And at best, it might be medically necessary. And that your guy even said that she's subject to, you know, sort of real harm if she's not given this stuff. So what's the truth of that factual issue? The truth of the medical team, Dr. Johnson, who was the head of that team, flat out, without any questions, said it is not medically necessary to have long hair or wear makeup. And every case that's ever confronted that issue has said the same thing. Dr. Levine, our expert, said, yes, it could be something the Department could do to be psychologically pleasing to the plaintiff. He said, without any question or ambiguity, however, that it was not medically necessary for Ms. Cohane to have long hair and wear makeup. And he flat out said that. And he even said, what you're doing, and he listed each of the things. I think it's on page maybe 413 of the record, second day. He listed all the things we were doing and said, without question, that constitutes adequate care. So we very much have a difference of opinion in Dr. Brown, who authored the WPATH standards that say they're applicable in prison, but at the same time under cross-examination said, well, not everything. You don't get to have earrings or wear heels. Did your guy, Levine, did he define medical necessity the way it was described to me earlier? Does that mean something that's not going to kill her? No, he is a psychiatrist who very much is aware of the acute mental distress that could come from a true deliberate indifferent case. He never said that at all. He said the opposite, I shouldn't be treating broken legs, but I can definitely understand that mental does not just mean physical. What he said is that it can't be medically necessary to have long hair because plenty of women have short hair. Plenty of women do not have that need or desire to wear makeup. So what we're doing here is we're turning over the medical diagnosis to the inmate, and there's no question about that's what we're doing. An affirmance of this opinion would say that. Anything the inmate says, I want or I'm going to kill myself. Walker doesn't say that in his opinion. He doesn't say that in his order, that anything she wants, she gets. He doesn't say that. He relies on specific factual findings that there are certain things that the medical experts say that are necessary in order to treat her dysphoria that he makes a determination is medically necessary. He doesn't say everything she wants, she gets. He does not say that. Only her experts said that the things that she wants are medically necessary. And all of our staff and experts said it is not. And the case law is fairly clear when you have a disagreement, an honest disagreement about a very fluid area of medicine. It cannot be deliberately indifferent because you can't prove the subjective awareness from the officers that would know something yet do it anyway. And so finally, I would think despite any factual finding, the overarching impression one gets of Judge Walker's order is he just downplays the prison setting. We're in a prison here, and I think it doesn't take a great leap of common sense to say heavily feminizing a prisoner in a male prison is not a good idea for security concerns. So those are always there. You can't take security away. But the things we're doing have been recognized over and over, hormone therapy, counseling, pronoun usage. If you're doing these things, and these things admittedly from Ms. Cohane's own testimony help, and we are trying to help, then we can't be deliberately indifferent. So we would ask the court to, on the merits of the case, dissolve the injunction and render an opinion in the Department's favor. And I thank you for the extra time. All right. Thank you, Mr. Reed, Mr. Tilley. The case was well argued. We're going to take one more case and then take a recess.